IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

INTERNATIONAL ASSOCIATION OF
MACHINISTS
AND AEROSPACE WORKERS, AFL-CIO,　　　Civil Action No.:　2:19-cv-3214-BHH
9000 Machinists Place
Upper Marlboro, Maryland 20772

      Plaintiffs,

v.

JOHN RING, Chairman, LAUREN　　　　　　**COMPLAINT FOR**
MCFERRAN, Board Member, MARVIN　　　**DECLARATORY AND**
KAPLAN, Board Member, WILLIAM　　　　 **INJUNCTIVE RELIEF**
EMANUEL, Board Member, and the
NATIONAL LABOR RELATIONS
BOARD,
1015 Half Street, SE
Washington, DC 20570

      Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

    Plaintiff International Association of Machinists and Aerospace Workers ("IAM") brings this action against the Chairman and current Board Members of the National Labor Relations Board ("NLRB" or "Board" or "Agency"), as well as the Agency itself, seeking declaratory and injunctive relief holding that the Board acted beyond its statutory authority under the National Labor Relations Act ("NLRA" or "the Act") in issuing its decision in *The Boeing Company*, 368 NLRB No. 67 (Sept. 9, 2019).

    In seeking review of the *Boeing* decision in this court, the IAM invokes the *Leedom v. Kyne,* 358 U.S. 184 (1958) exception to the general rule that NLRB representation case decisions, such as *Boeing*, are not directly judicially reviewable.  Ordinarily, a party seeking judicial review of a representation case must commit an unfair labor practice, and then obtain review of the

representation issues in the context of a petition for review of the related Board unfair labor practice determination in the federal circuit courts pursuant to NLRA Section 10(f), 29 U.S.C. § 160(f). In *Leedom v. Kyne*, the Supreme Court crafted a narrow exception to this limited unfair labor practice path to review of representation issues, determining that federal district courts have jurisdiction to strike down NLRB representation case orders issued in excess of the Agency's delegated powers.

In *Boeing*, the NLRB adopted a new three-step process for exercising its statutory authority to "decide in each case whether, in order to assure employees the fullest freedom in exercising the rights guaranteed by [the Act], the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof," 29 U.S.C. §159(b), and applied that new process to vacate the results of an election in which Boeing employees had voted overwhelmingly to have the IAM represent them. In doing so, the Board acted in excess of its delegated statutory authority twice: at the first and again at the second step of the new process.

The Board's application of the new process's first step—whether the Boeing employees in the unit share a community of interest with each other—exceeded its statutory authority because it held that Boeing employees who shared "nearly identical terms and conditions of employment" did not share any community of interest. The Board reached this conclusion, contrary to the Act's explicit language, by giving no weight to the employment terms—common "rates of pay, wages, hours of employment"—explicitly delineated in the Act. The Board exceeded its authority at the second step of the new process as well; by weighing the appropriateness of the petitioned-for unit against the appropriateness of a hypothetical unit including all employees, the second step necessarily results in the Board's selection of a "more appropriate" unit, rather than "an appropriate unit," as the law requires.

2

Moreover, the Board's delay in issuing its decision—some 15 months after the IAM's decisive victory—precludes the IAM from picketing to obtain circuit court review of the Board's bargaining unit determination in an unfair labor practice proceeding. The IAM therefore invokes the equitable jurisdiction of this court to vacate the Board's decision issued in excess of its delegated statutory powers. Absent the court's review, the IAM will be wholly deprived of any means to vindicate its (and the Boeing employees') statutory rights.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and the Federal Declaratory Judgment Act, as amended, 28 U.S.C. §§ 2201 and 2202. This action arises under and concerns provisions of the NLRA, as amended, 29 U.S.C. §§ 151 - 169.

2. Specifically, this Court is authorized by *Leedom v. Kyne*, 358 U.S. 184 (1958), and its progeny to review actions of the NLRB in excess of the Agency's delegated powers.

3. Venue is proper under 28 U.S.C. § 1391(b)(2) in the U. S. District Court for the District of South Carolina, Charleston Division because the workers whose vote in favor of union representation has been vacated by the NLRB decision at issue work at a Boeing aircraft manufacturing facility in North Charleston, South Carolina. Thus, a substantial part of the events giving rise to this claim occurred in South Carolina.

## PARTIES

4. Plaintiff IAM is an international labor organization within the meaning of Section 2(5) of the NLRA, 29 U.S.C. § 152(5). The IAM has approximately 600,000 members and is the collective bargaining representative of approximately 33,000 employees of the Boeing Company. The IAM filed the petition in Case 10-RC-215878, seeking to become the collective bargaining

3

representative of 178 Boeing employees working in North Charleston, South Carolina, and those employees voted overwhelmingly to be represented by the IAM. The IAM's headquarters is at 9000 Machinists Place, Upper Marlboro, Maryland.

5.  Defendant John Ring is the Chairman of the NLRB, and Defendants Lauren McFerran, Marvin Kaplan, and William Emanuel are Board Members of the NLRB. Their offices are at 1015 Half Street, SE, Washington, DC 20570. They are sued in their official capacity.

6.  Chairman Ring and Board Members Kaplan and Emmanuel issued the majority opinion in *The Boeing Company*, 368 NLRB No. 67 (Sept. 9, 2019), declaring inappropriate the bargaining unit of Boeing employees who voted to have the IAM represent them, reversing the decision to the contrary of NLRB Regional Director John Doyle, and vacating the results of the election the IAM had won 104-65 more than 15 months prior. Board Member McFerran dissented.

7.  Defendant NLRB is an independent agency of the United States government, established by Congress in 1935 for the purposes of administering the NLRA.

### FACTS

8.  The Boeing Company ("Boeing") manufactures commercial 787 aircraft at its facility in North Charleston, South Carolina. It employs more than 2,000 production and maintenance employees to construct the aircraft.

9.  Boeing also employs approximately 178 employees on its "flight line," a geographically distinct area about one half mile outside of its North Charleston production building, to assure the flightworthiness of 787 aircraft once they are constructed. These employees—Flight-Line Readiness Technicians ("FRTs") and Flight-Line Readiness Technician Inspectors ("FRTIs")—are the only employees in Boeing's DEJ1 job classification.

4

10. The FRTs and FRTIs alone perform about 107 unique tasks to assure aircraft flightworthiness. Boeing provides them with separate training and tools to perform these tasks, and Boeing requires them alone, as a condition of employment, to have and maintain a Federal Aviation Administration-issued airframe and powerplant ("A&P") license.

11. In recognition of these workers' special skills and abilities, Boeing pays them on average 32.55% more than the production workers in the plant and, in December 2016, granted them an unprecedented, out-of-sequence 7% raise given to no other Boeing employees, explaining at the time that their "skill requires additional expertise and certifications, which is why the pay scale is different at Boeing and other companies."

12. FRTs and FRTIs work separate shifts and separate hours from the production employees. They are required to work mandatory overtime when other workers are not. And they also have separate supervision from the production workers.

13. Apart from these and other separate terms and conditions of employment, the FRTs and FRTIs do share a number of common policies and benefits with the Boeing production workers.

14. In early 2018, FRTs and FRTIs approached several unions, seeking one willing to support their interest in unionization. They chose the IAM. The IAM gathered support among the FRTs and FRTIs and, on March 5, 2018, filed a representation petition with Region 10 of the NLRB, Case 10-RC-215878, seeking to become the exclusive collective bargaining representative of the FRTs and FRTIs.

15. Region 10 conducted an eight-day hearing on the representation petition, at which both Boeing and the IAM were represented by counsel. Boeing contended that the FRTs and FRTIs, despite the separate terms and conditions of employment Boeing had unilaterally

5

established for them, were not a unit appropriate for collective bargaining. Boeing argued that the only appropriate bargaining unit at its North Charleston facility would combine the 178 FRTs and FRTIs with all of the more than 2,000 production workers. The IAM argued that the petitioned-for unit of FRTs and FRTIs should be recognized as an appropriate subdivision-of-a- plant unit under Section 9(b), 29 U.S.C. § 159(b).

16. On May 21, 2018, the Region 10 Regional Director issued an extensive 38-page decision directing an election in the petitioned-for unit of FRTs and FRTIs. *See* Exhibit A attached to this Complaint. The Regional Director carefully summarized all of the "community of interest" factors—both with respect to employees in the petitioned-for unit and employees outside of the unit—under the appropriate collective bargaining unit test as stated in *PCC Structurals, Inc.*, 365 NLRB No. 160 (2017) and *United Operations, Inc.*, 338 NLRB 123 (2002). He concluded that the petitioned-for unit was appropriate for collective bargaining because: "the Employer treats the FRTs and FRTIs differently with respect to critical terms and conditions of employment including wages, raises, schedules and lay-offs based on the FRTs and FRTIs distinct skill set and certifications, including the A&P license. Moreover, the FRTs and FRTIs fulfill a unique job function of assuring the airworthiness of airplanes at the end of the Employer's process after manufacture is essentially completed. Further, the Employer readily identifies the petitioned-for unit in a variety of ways including through the issuance of special apparel and its internal job coding and separately supervises FRTs and FRTIs at the first level. Lastly, the petitioned-for employees' location on the Flight Line constitutes a meaningful separation that limits their contact with most other production and maintenance employees."

17. The Regional Director directed an election to be held on May 31, 2018 among the FRTs and FRTIs to vote on whether they wanted the IAM to be their exclusive representative for purposes of collective bargaining.

18. On May 23, 2018, Boeing filed a motion to stay the election or, in the alternative, to impound the ballots, contending that "the Regional Director directed an election in an artificially gerrymandered sub-set of employees." Boeing did not file a request for review of the Regional Director's unit determination at that time, stating only that it intended to do so.

19. On May 30, 2018, the Board denied Boeing's motion.

20. On May 31, 2018, Region 10 conducted the representation election and the employees voted 104-65, with one challenged ballot which was not counted as it was non-determinative, to have the IAM represent them. Boeing did not file any objections to the conduct of the election with the Region, and the Regional Director issued a certification of representative on June 12, 2018.

21. On June 26, 2018, well after the election was held and the results certified, Boeing filed a request for review with the Board, contending that the unit of FRTs and FRTIs was inappropriate for collective bargaining.

22. More than a year after the request for review was filed, on September 9, 2019, the Board issued its decision on it, *The Boeing Company*, 368 NLRB No. 67. *See* Exhibit B attached to this Complaint.

23. The Board decision did not rely on extant law; rather, it announced a new, three-step process for determining an appropriate bargaining unit. Applying this new process, the Board determined that the petitioned-for bargaining unit was at once too large and too small—if there

was some "just right" bargaining unit size that the Board would have found appropriate, it did not say what that would have been.

24. Specifically, the Board described the three steps as follows: 1) identifying shared interests within the petitioned-for unit, *i.e.*, whether the petitioned-for employees shared a community of interest with each other; 2) a comparative analysis of the petitioned-for employees and the employees that would be excluded from the petitioned-for unit to determine "whether the employees excluded from the unit 'have meaningfully distinct interests in the context of collective bargaining that *outweigh* similarities with unit members'… If those distinct interests do not outweigh the similarities, then the unit is inappropriate"; and 3) whether there is any established precedent for the specific industry with regard to appropriate unit configurations.

25. Applying the first step, the Board, in a single perfunctory paragraph, held that while the FRTs and FRTIs "share nearly identical terms and conditions of employment" they have "significantly different interests in the context of collective bargaining" and did not share a community of interest with each other, ignoring, among other things, that the FRTs and FRTIs share the same DEJ1 job classification. For that reason, in the Board's view, the petitioned-for unit was too large.

26. At the second step, the Board compared the interests of the petitioned-for unit and those employees not seeking union representation. The Board acknowledged the petitioned-for unit's higher average wages, separate training and licensing requirements, and separate location from the rest of the unit, concluding that these factors are "relatively insignificant in the context of collective bargaining." (The Board did not mention at all the petitioned-for unit's separate shifts and hours, or the occasions when unit workers had mandatory overtime and the rest of the facility did not.) Outweighing these factors, it held, were the terms and conditions of employment that the

8

petitioned-for unit shared with the excluded employees. The Board concluded: "We find that excluded production-and-maintenance employees would largely have the same interests as FRTs and FRTIs in the context of collective bargaining and thus the petitioned-for unit's distinct interests certainly do not outweigh the interests shared with excluded employees. Because the petitioned-for unit does not share a community of interest that is sufficiently distinct from the interests of excluded employees, the unit is also inappropriate under the second step." For that reason, in the Board's view, the petitioned-for unit was too small.

27. The Board's conclusion at the second step directly contradicted its conclusion at the first step—its second-step determination that the FRTs and FRTIs both share interests with excluded employees sufficient to constitute a community of interest between them and the excluded employees means that the FRTs and FRTIs necessarily share that same community of interest with each other.

28. On the third step, the Board found that there were no industry specific guidelines applicable to the case.

29. Based on the application of its three-step process, the Board determined that the unit found appropriate by the Regional Director, in which the IAM had won the election, was not an appropriate unit for collective bargaining. The Board granted Boeing's request for review, reversed the Regional Director, vacated the certification of the IAM's victory in the election, and dismissed the IAM's representation petition.

**CLAIM FOR RELIEF**
**COUNT ONE**

Paragraphs 1 through 29 of this Complaint are incorporated by reference, as though more fully set forth below.

30. The NLRA contains no explicit prohibition on federal district court jurisdiction to address Board representation case determinations. However, Section 10(f), 29 U.S.C. § 160(f), authorizes federal circuit court review of the Board's determinations in unfair labor practice cases. Thus, to obtain review of a representation case, ordinarily the party seeking review must commit an unfair labor practice and seek review of the related representation case in the context of challenging the Board's unfair labor practice determination.

31. For employers, the path to review of a representation case is straightforward: To challenge the Board's unit determination, "the employer must refuse to bargain, triggering unfair labor practice proceedings under Section 8(a)(5)." *Wellman Indus., Inc. v. NLRB*, 490 F.2d 427, 430 (4th Cir. 1974). For unions, however, whether review is available and how to obtain it is much less clear. Some courts have indicated that, if the union pickets the employer seeking recognition within one year of the certification of the results of a valid NLRB-conducted election, the underlying representation case would be reviewable in the context of an unfair labor practice proceeding under Section 8(b)(7)(B), 29 U.S.C. § 158(b)(7)(B), which provides that it is an unfair labor practice for a union to picket "where within the preceding twelve months a valid election under section 9(c) of this Act has been conducted." *See United Fed'n of Coll. Teachers, Local 1460 v. Miller*, 479 F.2nd 1074, 1078-1079 (2d Cir. 1973). Others have disagreed: "Unlike the employer, who has it within his own power to preserve the status quo by refusing to bargain, and to obtain judicial review if the Board proceeds against it under § 10, the losing union is left without a collective bargaining relationship, and with no certainty that its resort to picketing will produce an unfair labor practice charge. If the picketed employer finds the picketing ineffective, he may refrain from filing a charge. The General Counsel may decline to act even if a charge is filed. Moreover, to insist that a losing union begin recognitional picketing in violation of § 8(b)(7)(B)

would seem to contravene Congress' purpose in enacting the statute—limiting such picketing and avoiding its disruptive impact. Worst of all, an employee adherent of the losing union may, by picketing in violation of Section 8(b)(7)(B) and thus committing an unfair labor practice, incur a risk of discharge for cause. Thus it is no answer to [the union's] complaint in intervention that there is an available statutory means for obtaining judicial review. The remedy suggested is entirely too speculative to be considered realistically available." *NLRB v. Interstate Dress Carriers*, 610 F.2d 99, 108-109 (3d. Cir. 1979) (internal citations and footnote omitted).

32. In *Leedom v. Kyne*, 358 U.S. 184 (1958), the Supreme Court outlined an exception to the above-described unfair labor practice route for obtaining judicial review of representation matters, determining that federal district courts have jurisdiction to strike down Board orders in representation cases issued in excess of the Board's delegated powers. Cases subsequent to *Leedom* have made clear that, in addition to the Board acting in excess of a clear statutory mandate, the party invoking the district court's jurisdiction must demonstrate that, absent judicial intervention, the party would be wholly deprived of a meaningful and adequate means of vindicating its statutory rights. *See, e.g., Pac. Maritime Ass'n v. NLRB*, 827 F.3d 1203, 1208 (9th Cir. 2016). It is this *Leedom v. Kyne* exception that Plaintiff IAM invokes here.

33. The NLRB exceeded its statutory authority in two separate ways in its *Boeing* decision.

34. First, at the initial step of its newly created three-step analysis, the Board exceeded its statutory authority when it determined that the FRTs and FRTIs shared "nearly identical terms and conditions of employment" but did not share any community of interest with each other.

35. The NLRA mandates that a unit appropriate for the purposes of collective bargaining is a unit that is appropriate "for the purposes of collective bargaining *in respect to rates of pay,*

11

*wages, hours of employment, or other conditions of employment,*" 29 U.S.C. § 159(a) (emphasis added).

36. Thus, when the Board determines whether a petitioned-for bargaining unit is an appropriate one for collective bargaining, the statute requires that the Board give at least *some* weight to the statutorily specified "rates of pay, wages, hours of employment, or other conditions of employment" in making that determination. Indeed, "[t]he central test is whether the workers share a 'community of interest,'" that is, 'substantial mutual interests in wages, hours, and other conditions of employment.'" *Skyline Distribs. v. NLRB*, 99 F.3d 403, 406 (D.C. Cir. 1996) (quoting *Allied Chem. & Alkali Workers of Am., Local Union No. 1. v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 173 (1971)).

37. Where employees share "nearly identical terms and conditions of employment"—including the statutorily specified "rates of pay, wages, hours of employment, and other conditions of employment"—they necessarily share *some* community of interest for the statutorily described purposes of collective bargaining.

38. The Board's conclusion at the first step of its new process in *Boeing*—that despite having "nearly identical terms and conditions of employment" which specifically included common rates of pay, wages, and hours (the statutorily specified conditions of employment), the FRTs and FRTIs did not share any community of interest with each other—violated the clear statutory mandate that the Board define bargaining units appropriate "for the purposes of collective bargaining *in respect to rates of pay, wages, hours of employment, or other conditions of employment*." 29 U.S.C. § 159(a) (emphasis added). The Board ignored the statutorily stated terms of employment, giving no weight to common rates of pay and wages, and failing to even mention or consider the FRTs and FRTIs common shifts and hours.

12

39. By relying only on non-statutorily defined aspects of the FRTs and FRTIs employment and giving no weight to the employment conditions specifically stated in the statute, the Board's decision at the first step of *Boeing's* three-step process exceeded the scope of the Board's delegated powers.

40. The second way the Board violated a clear statutory mandate in *Boeing* came at the second step of its new three-step process, when it examined the interests of employees who had not sought to be included in the petitioned-for unit and determined that they "would largely have the same interests as FRTs and FRTIs in the context of collective bargaining," and that those common interests (asserted by Boeing but unasserted by the employees not seeking representation) outweighed the interests of the employees seeking representation. In the Board majority's view, these common interests rendered the petitioned-for unit inappropriate for purposes of collective bargaining.

41. The NLRA requires "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in *a* unit appropriate for such purposes shall be the exclusive representatives of all the employees in such unit..." 29 U.S.C. § 159(a) (emphasis added).

42. As the Supreme Court has explained, this statutory language provides "that employees may seek to organize 'a unit' that is 'appropriate'—not necessarily *the* single most appropriate unit." *Am. Hosp. Ass'n. v. NLRB*, 499 U.S. 606, 610 (1991).

43. The NLRA further instructs the Board that "the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, *or subdivision thereof*." 29 U.S.C. § 159(b) (emphasis added).

44. The NLRA's clear statutory mandate is that multiple appropriate bargaining units may exist in any given workplace.

45. In *Boeing*, however, the Board purported to apply a community-of-interest standard that evaluated "whether the employees excluded from the [certified] unit 'have meaningfully distinct interests in the context of collective bargaining that *outweigh* similarities with unit members.' If those distinct interests do not outweigh the similarities, then the unit is inappropriate." *Boeing* slip op. 4 (internal citation omitted) (emphasis in original).

46. That second step requires the Board to compare two potential bargaining units: a proposed bargaining unit whose members share a community of interest (as determined at the first step) and a hypothetical unit that includes the petitioned-for employees with other employees. To the extent that the employees in the latter group share similar terms and conditions of employment as the employees in the former group—as the Board found was present in *Boeing*—the Board's test necessarily requires that the Board designate which is the *more* appropriate of two otherwise equivalent groups.

47. The standard applied in *Boeing* thus violates the NLRA's mandate that, "while the Board's chosen unit must be appropriate, it need not be the only or even the most appropriate unit." *Dunbar Armored, Inc. v. NLRB*, 186 F.3d 844, 847 (7th Cir. 1999) (citing *Am. Hosp. Ass'n*, 499 U.S. at 610).

48. The Board's adoption of the second step analysis in *Boeing* thus exceeded the scope of its delegated powers.

49. Moreover, the Board's conclusion that the FRTs and the FRTIs have essentially the same collective bargaining interests as the non-petitioned for employees and thus all of them share a community of interest directly contradicts the Board's determination at the first step in *Boeing*

14

that the FRTs and FRTIs do not share any community of interest with each other—if the FRTs and FRTIs commonly share a community of interest with the excluded employees then they must share that same community of interest with each other, too. Accordingly, the first two steps of the NLRB's new process collectively, as applied, require a unit (if there is any such unit), that is not too big, and not too small, but is just right. In this way the Board's new standard, as applied, plainly exceed the scope of the Board's delegated powers.

50. Although the Board's *Boeing* decision clearly exceeded the Board's statutory authority in two specific ways, as set forth in ¶¶ 33-48 above, Plaintiff IAM is not capable of obtaining review of the decision in the federal circuit courts of appeals pursuant to Section 10(f), 29 U.S.C. § 160(f).

51. As described in ¶¶ 30-31 above, the ordinary path for obtaining judicial review of a Board representation case requires the party seeking review to commit an unfair labor practice and then seek review of the underlying representation issue in the context of the circuit court of appeals' review of the unfair labor practice case. There is no judicial consensus that this unfair labor practice route is available to unions at all.

52. Even if the unfair labor practice route to review of a representation case were theoretically available to a union, such a course is not available to Plaintiff IAM here. That is so because the valid election, which the IAM won overwhelmingly and to which Boeing did not file objections, was conducted on May 31, 2018, and the Board did not issue the decision the IAM seeks to challenge here until September 9, 2019, well over a year after the election. Thus, any picketing the IAM conducted now would be over a year after the election and would not violate Section 8(b)(7)(B).

53. Under these circumstances, absent the assertion of jurisdiction by this Court, the NLRB's actions in excess of its statutory authority and contrary to express statutory commands will stand unaddressed and the statutory rights of the IAM and Boeing employees will not be vindicated.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff IAM requests this Court enter judgment in its favor and:

1. Declare that Defendants exceeded their statutory authority in issuing their decision in *The Boeing Company*, 368 NLRB No. 67 (Sept. 9, 2019);

2. Vacate and set aside the decision in *The Boeing Company*, 368 NLRB No. 67 (Sept. 9, 2019);

3. Enjoin and restrain Defendants, their agents, employees, successors, and all other persons from giving effect to the decision in *The Boeing Company*, 368 NLRB No. 67 (Sept. 9, 2019);

4. Order Defendants to take any and all actions necessary to remedy the effects of their decision in *The Boeing Company*, 368 NLRB No. 67 (Sept. 9, 2019), including making bargaining unit members whole;

5. Award Plaintiff IAM its costs of litigation, including reasonable attorney's fees; and

6. Grant Plaintiff IAM such other and further relief as may be necessary and appropriate or as the Court deems just and proper.

Respectfully submitted,

Date: November 13, 2019						By: s/Armand Derfner
								Armand G. Derfner
								District Court I.D. #528
								Derfner & Altman, LLC
								575 King Street, Suite B
								Charleston, SC  29403
								(843) 723-9804
								aderfner@derfneraltman.com

								*Counsel for Plaintiff IAM*