**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO,<br><br>                              Plaintiff,<br><br>v.<br><br>JOHN RING, Chairman, MARVIN KAPLAN, Board Member, WILLIAM EMANUEL, Board Member, and the NATIONAL LABOR RELATIONS BOARD,<br><br>                              Defendants. | Civil Action No. 2:19-cv-3214-BHH |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' AND PROPOSED**
**INTERVENOR'S MOTIONS TO DISMISS FOR LACK OF**
**SUBJECT MATTER JURISDICTION**

Defendants (collectively, "the Board")[1] and proposed intervenor the Boeing Company

("Boeing") devote much of their briefing to claims that the Complaint never made.  They spend

pages proving up the truism that "Congress intended to circumscribe review of the Board's

representation proceedings"[2]—even though the actual Complaint filed by Plaintiff International

---

[1] Defendants are the National Labor Relations Board, its chair, John Ring, and its remaining members, Marvin Kaplan and William Emanuel in their official capacities.  Although the initial complaint named former member Lauren McFerran as a defendant, this Court granted the parties' joint motion to dismiss her from this litigation following the conclusion of her term on the Board.  Order (Jan. 15, 2020) (ECF No. 23).

[2] Board Mem. Supp. Mot. Dismiss 26 ("Bd. MTD") (Jan. 31, 2020) (ECF No. 25-1); *see also id.* at 8-10, 26-27; Boeing Mem. Supp. Mot. Dismiss 2, 12-14 ("Boeing MTD") (Jan. 31, 2020) (ECF No. 26).

Association of Machinists and Aerospace Workers ("IAM") embraces "the general rule that NLRB representation case decisions . . . are not directly judicially reviewable."[3]  They suggest that the IAM seeks an order "find[ing] that the bargaining unit proposed in IAM's petition was an appropriate unit"[4]—even though the Complaint actually "invokes the equitable jurisdiction of this court to vacate the Board's decision issued in excess of its delegated statutory powers."[5]  And carried away by their misreading of the Complaint, the Board accuses the IAM of "ask[ing] this Court to perform exactly the kind of re-weighting of facts and legal conclusions forbidden by long-established case law"[6]—even though the Complaint does nothing of the kind and seeks only to *prevent* the Board from taking unlawful action in derogation of express statutory mandates.

This Court clearly possesses the power to grant the limited relief the IAM seeks here.  As the Supreme Court long ago recognized in *Leedom v. Kyne*, federal district courts have jurisdiction "to strike down an order of the Board made in excess of its delegated powers," where "there is no other means, within [Plaintiff's] control, to protect and enforce" a statutory right. 358 U.S. 184, 188, 190 (1958) (internal citations omitted).  That jurisdiction rests on the refusal of the federal courts to "lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers."  *Leedom*, 358 U.S. at 190. That doctrine is not some aberrant, "casual presumption" ripe for reconsideration, as Boeing asserts.  Boeing MTD 23-24.  To the contrary, *Leedom* recognized what the Supreme Court recently characterized as a "'*strong* presumption that Congress intends judicial review of

---

[3] Compl. 1 (Nov. 13, 2019) (ECF No. 1).

[4] Bd. MTD 11; *see also* Boeing MTD 19.

[5] Compl. 3.

[6] Bd. MTD 15.

administrative action.'" *Smith v. Berryhill*, 139 S. Ct. 1765, 1776 (2019) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S 667, 670 (1986)) (emphasis added). And that strong presumption is "consistently applied" and "'well-settled.'" *Kucana v. Holder*, 558 U.S. 233, 251-52 (2010) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 63-64 (1993)).[7]

When courts police the statutory metes and bounds of agency authority, they guard against lawless agency action and vindicate the rule of law in the administrative state. The presumption of judicial oversight recognized by *Leedom* is thus rooted in Chief Justice Marshall's insistence, in *Marbury v. Madison*, "that '[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws.'" *Bowen*, 476 U.S. at 670 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803), to explain the origins of the presumption of judicial oversight). "'Otherwise, the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law.'" *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996) (quoting *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902)). Judicial oversight is most urgently needed where an agency abandons its statutory obligations out of deference to a powerful corporation, depriving workers of the very right to be represented by a union that the agency's organic statute was created to promote and protect.

---

[7] Boeing claims that, since *Leedom*, "[t]he Supreme Court . . . has rejected that presumption" of judicial review, citing *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001). Boeing MTD 23. That argument is dead wrong and underlines Boeing's fundamental misapprehension of the nature of this litigation. As the Sixth Circuit recently explained, "[t]here is a major difference between a plaintiff attempting to obtain a remedy against a person subject to federal regulations, and a plaintiff attempting to hold an agency accountable for alleged violations of its own rules. *Sandoval* spoke to the former situation—alleged misconduct by a regulated person. But this case involves the latter situation—review of agency action. . . . *Sandoval* did not overturn the presumption of reviewability that applies in the context of judicial review of agency action." *Duncan v. Muzyn*, 833 F.3d 567, 578-79 (6th Cir. 2016).

3

The Board's disregard for its statutory mandate in *The Boeing Company*, 368 NLRB No. 67 (Sept. 9, 2019) (appended as Exhibit B to the Complaint) (hereafter "*Boeing* Slip Op."), is precisely the sort of agency action in derogation of explicit statutory language that this Court's *Leedom* jurisdiction is designed to restrain.  In *Boeing*, the Board denied a group of Boeing employees their statutory right to be represented for the purposes of collective bargaining by the IAM, which the workers had selected at the ballot box by an overwhelming margin to serve as their bargaining representative.  The Board vitiated the results of that election in the name of discharging the statutory mandate that it "shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate *for the purposes of collective bargaining* shall be the employer unit, craft unit, plant unit, or subdivision thereof," 29 U.S.C. § 159(b) (emphasis added).

To honor that mandate, the Board minted a novel, three-step analysis that was purportedly necessary to apply "'the traditional community-of-interest standard that [the Board] has applied throughout most of its history,'" *Boeing* Slip Op. 2—but that, in the circumstances of this case, did not apply the Board's traditional standard so much as eviscerate it.  At the first step of that analysis, the Board gave no weight to Congress' definition of "the purposes of collective bargaining" as "collective bargaining *in respect to rates of pay, wages, hours of employment, or other conditions of employment.*"  29 U.S.C. § 159(a).  And at the second step of that analysis, which contradicts the first, the Board applied a standard that precludes it from recognizing any "subdivision" of an employer's workforce as an appropriate bargaining unit, 29 U.S.C. § 159(b), if a larger unit would be more appropriate.  It thus ignored the long-settled understanding of the statute "that employees may seek to organize 'a unit' that is 'appropriate'—not necessarily *the* single most appropriate unit."  *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 610 (1991) (explaining

4

29 U.S.C. § 159(a)) (emphasis in original).  We explain both of these *ultra vires* acts in more detail in Part I and Part II, below.

This lawsuit is now the sole means to prevent the Board's unlawful decision from taking effect.  Although the Board insists that the IAM can violate Section 8(b)(7)(C) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 158(b)(7)(C), and thereby obtain review of the *Boeing* decision in the courts of appeal in a related unfair labor practice case, that prescription would result in a *new election* that would require a new unit determination, rather than review of the Board's unlawful decision in this matter—Case 10-RC-215878—as we explain in Part III.  Forcing the IAM to commit an unfair labor practice is thus no substitute for this litigation.

## BACKGROUND

### I.    The distinctive working conditions of the "flight line" at Boeing's North Charleston facility.

The IAM is an international labor union that serves as the collective bargaining representative of roughly 33,000 Boeing employees.  Compl. ¶ 4.  Among other operations, Boeing manufactures commercial 787 aircraft at a production facility in North Charleston, South Carolina, where it employs over 2,000 production and maintenance workers.  Compl. ¶ 8.  Like most employees working for a single employer in a single production facility, those workers are subject to many of the same policies and share a number of employment benefits.  Compl. ¶ 13.  Boeing also employs approximately 178 Flight-Line Readiness Technicians ("FRTs") and Flight-Line Readiness Technician Inspectors ("FRTIs"), Compl. ¶ 9, who constitute a distinctive community of workers within Boeing's North Charleston facility.

Boeing's FRTs and FRTIs work on the so-called "flight line"—a geographically distinct portion of the facility located about a half mile from the primary production building—to

guarantee the flightworthiness of 787 aircraft after their construction.  Compl. ¶ 9.  That geographically isolated and sensitive work is broken out into 107 unique tasks, for which Boeing provides special training to the FRTs and FRTIs.  Compl. ¶ 10.  Indeed, their skills are so specialized that Boeing requires those employees—unlike the production workers in North Charleston—to obtain and maintain a particular license from the Federal Aviation Administration, known as an "Airframe and Powerplant (A&P) License."  Compl. ¶ 10.

In recognition of the specialized training and skills of its FRTs and FRTIs, Boeing pays them substantially more than its production employees in North Charleston.  On average, those FRTs and FRTIs are paid over 32% more than the production and maintenance employees working off the flight line.  Compl. ¶ 11.  In December 2016, for example, Boeing rewarded its flight-line employees with an unprecedented and out-of-sequence 7% raise.  Compl. ¶ 11. Boeing explained that no other North Charleston employee received that raise because FRTs' and FRTIs' "skill requires additional expertise and certifications, which is why the pay scale is different at Boeing and other companies."  Compl. ¶ 11.

Boeing has also established distinctive schedules for the FRTs and FRTIs that vary from the schedules of Boeing employees who do not work on the geographically isolated flight line. The FTIs and FRTIs share shifts and hours that are different from the shifts and hours of North Charleston's production employees.  Compl. ¶ 12.  And the FRTs and FRTIs work mandatory overtime when production employees do not.  Compl. ¶ 12.

No doubt on account of the special skills, special qualifications, special pay, special hours, and special workplace of the FRTs and FRTIs, Boeing supervises those employees separately from its remaining North Charleston employees and classifies them—and them alone—in its DEJ1 job classification.  Compl. ¶¶ 9, 12.

6

II.    **The FRTs' and FRTIs' organizing campaign and electoral victory.**

In early 2018, FRTs and FRTIs approached several labor organizations, seeking support for their effort to form a union in North Charleston. Compl. ¶ 14. They ultimately selected the IAM. Compl. ¶ 14. On March 5, 2018, after gathering sufficient support among the FRTs and FRTIs, the IAM filed with Region 10 of the Board a representation petition for a secret-ballot election to become the exclusive collective-bargaining representative of a bargaining unit consisting of the FRTs and FRTIs. Compl. ¶ 14.

At an eight-day evidentiary hearing convened by Region 10, Boeing argued that the requested bargaining unit was inappropriate for the purpose of collective bargaining. Compl. ¶ 15. On Boeing's account, only a unit consisting of *all* North Charleston's production and maintenance employees, including both the FRTs and FRTIs, would be appropriate for that purpose. Compl. ¶ 15. On May 21, 2018, the Regional Director for Region 10 issued a thorough and comprehensive 38-page decision that rejected Boeing's arguments and instead directed a secret-ballot election in a bargaining unit consisting of FRTs and FRTIs. Compl. ¶ 16. The Regional Director summarized the basis for his decision as follows:

> [T]he employees in the petitioned-for unit share a sufficiently distinct community of interest, are readily identifiable as a group, and are not a fractured unit because the Employer treats the FRTs and FRTIs differently with respect to critical terms and conditions of employment including wages, raises, schedules and lay-offs based on the FRTs and FRTIs distinct skill set and certifications, including the A&P license. Moreover, the FRTs and FRTIs fulfill a unique job function of assuring the airworthiness of airplanes at the end of the Employer's process after manufacture is essentially completed. Further, the Employer readily identifies the petitioned-for unit in a variety of ways including through the issuance of special apparel and its internal job coding and separately supervises FRTs and FRTIs at the first-level. Lastly, the petitioned-for employees' location on the Flight Line constitutes a meaningful separation that limits their contact with most other production and maintenance employees.

Compl. Ex. A ("RD Slip Op.") at 25; *see also* Compl. ¶ 16.

Eight days before the scheduled election, Boeing filed a motion with the Board to stay the election or impound the ballots.  Compl. ¶ 18; *see also* Compl. ¶ 17.  Although Boeing's motion asserted that the approved bargaining unit was "an artificially gerrymandered sub-set of employees," it did not seek review of the Regional Director's unit determination.  Compl. ¶ 18. The Board denied Boeing's motion.  Compl. ¶ 19.

Region 10 thus held a secret-ballot election on May 31, 2018, as scheduled.  Compl. ¶ 20. The IAM prevailed in that election by a wide margin, with 104 employees voting in favor of representation by the IAM, 65 voting against, and one challenged vote.  Compl. ¶ 20.  The Regional Director then issued a certification of representative on June 12, 2018, after Boeing declined to object to the conduct of the election.  Compl. ¶ 20.

## III.    The Board's long-delayed *Boeing* decision.

On June 26, 2018—two weeks after the certification and nearly a month after the election—Boeing finally sought the Board's review of the Regional Director's May 21, 2018 decision, asserting that a unit of FRTs and FRTIs was inappropriate for the purposes of collective bargaining.  Compl. ¶ 21.  Nearly 15 months later, on September 9, 2019, the Board issued its decision in *Boeing*, reversing the Regional Director's approval of the petitioned-for unit and denying the IAM the victory it had secured in the election.  Compl. ¶ 22.

In *Boeing*, the Board purported to apply "'the traditional community-of-interest standard that [it] has applied throughout most of its history.'"  *Boeing* Slip Op. 2 (alteration in original) (quoting *PCC Structurals, Inc.*, 365 NLRB No. 160, 2017 WL 6507219, at *8 (Dec. 15, 2017)). Notwithstanding the lengthy pedigree of that "traditional" standard, the Board deemed it

necessary to "clarify" that standard by minting a new, "three-step process for determining an appropriate bargaining unit":

> First, the proposed unit must share an internal community of interest. Second, the interests of those within the proposed unit and the shared and distinct interest of those excluded from that unit must be comparatively analyzed and weighed. Third, consideration must be given to the Board's decisions on appropriate units in the particular industry involved.

*Boeing* Slip Op. 3.

The Board's application of the first part of its newly minted process was brief: a single paragraph. At the outset, the Board recognized that the FRTs and FRTIs "share nearly identical terms and conditions of employment." *Boeing* Slip Op. 4. The Board nonetheless concluded not that those employees shared an *insufficient* community of interest to constitute an appropriate unit for the purposes of collective bargaining, but that they *entirely* "[l]ack[ed] an internal community of interest." *Boeing* Slip Op. 5. The Board's reasoning, in full, was as follows:

> On balance, we find that the interests shared by the petitioned-for employees, FRTs and FRTIs, are *too disparate to form a community of interest* within the petitioned-for unit. FRTs and FRTIs do share some interests that weigh in favor of the petitioned-for unit. They share nearly identical terms and conditions of employment, have frequent daily contact with each other on the Flight Line, and share many of the same skills and much of the same training, including A&P licenses. But FRTs and FRTIs also have significantly different interests in the context of collective bargaining. They belong to separate departments and do not share any supervision with each other, immediately or at any level below CEO. Beyond working toward completing the same SOIs, they have fundamentally different job functions from each other. FRTs are technicians who do the mechanical work, and FRTIs are inspectors who assure quality. Moreover, there has never been interchange between the FRT and FRTI classifications. *Lacking an internal community of interest*, the petitioned-for unit is inappropriate at the first step, and we need not continue the analysis any further.

*Boeing* Slip Op. 4-5 (emphases added).

The Board then moved to the second step of its novel test. That second step, the Board explained, "requires a comparative analysis of excluded and included employees" within the

9

proposed bargaining unit. *Boeing* Slip Op. 4. The Board conducted that comparative analysis as

an alternative basis for its decision, explaining that "the interests of excluded employees [from

the bargaining unit] are not meaningfully distinct from and do not outweigh similarities with the

interests of the petitioned-for employees." *Boeing* Slip Op. 5. The Board found that the FRTs

and FRTIs "are fully functionally integrated with excluded employees, share departments with

excluded employees, share supervision with excluded employees, perform a significant portion

of the same job functions as excluded employees, share most terms and conditions of

employment with excluded employees, and share most of the same skills and training with

excluded employees." *Boeing* Slip Op. 6. On the basis of those shared circumstances—which

describe nearly every integrated production facility in the country from time immemorial—the

Board concluded that "excluded production-and-maintenance employees would largely have the

same interests as FRTs and FRTIs in the context of collective bargaining and thus the petitioned-

for unit's distinct interests certainly do not outweigh the interests shared with excluded

employees." *Boeing* Slip Op. 6. Thus, the Board determined that a unit consisting of both the

included and excluded employees—a unit combining *all* production and maintenance employees

with the FRTs and FRTIs—would be more appropriate for the purposes of collective bargaining

than the petitioned-for unit consisting of FRTs and FRTIs.[8]

Former Board Member Lauren McFerran forcefully dissented. She emphasized that the

Board found that a bargaining unit of flight-line workers was inappropriate "based on factors

which apply to every single production and maintenance employee at the plant, leading to the

inescapable conclusion that the *only* appropriate bargaining unit here, at least under the

_____

[8] Finally, the Board concluded on step three of its new analysis that "[n]o industry-specific
guidelines are applicable to this case." *Boeing* Slip Op. 6. The IAM does not challenge that
component of the Board's analysis as unlawful.

10

majority's analysis, is one that combines every production and maintenance employee at [Boeing's] North Charleston plant." *Boeing* Op. 7. That analysis was "statutorily impermissible," she continued, and "cannot be squared with the mandates of the National Labor Relations Act." *Id.* at 8. That impermissibility derived from the Board's departure from the statutory principle "that a proposed unit be *an* appropriate unit," rather than the most appropriate unit. *Id.* at 11 (emphasis in original). Former Member McFerran concluded that the majority's rejection of that principle for the FRTs and FRTIs who overwhelmingly voted for union representation "cannot be reconciled with . . . the fundamental policies underlying the National Labor Relations Act" and resulted in the "denial of these workers' fundamental rights" under the statute. *Id.* at 19.

## ARGUMENT

As noted in the Complaint, this Court ordinarily lacks jurisdiction to pass on the Board's representation case decisions. Compl. 1-2. Long ago, however, the Supreme Court recognized an exception to that policy, endorsing the fundamental principle that federal courts wield the authority to "strike down an order of the Board made in excess of its delegated powers and contrary to a specific prohibition in the Act." *Leedom*, 358 U.S. at 188. That principle "can apply in cases involving either negative or positive statutory commands." *Nat'l Air Traffic Controllers Ass'n v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006). This Court's jurisdiction thus turns on "(1) a strong and clear demonstration that a clear, specific and mandatory statutory provision has been violated, and (2) the absence of federal court jurisdiction over an agency action would wholly deprive the aggrieved party of a meaningful and adequate means of vindicating its statutory rights." *Scottsdale Capital Advisors Corp. v. Fin. Indus.*

11

*Regulatory Auth., Inc.*, 844 F.3d 414, 421 (4th Cir. 2016) (internal quotations marks, citations, and brackets omitted).

The Board's disregard for its statutory mandate in *Boeing* presents precisely the "extraordinary circumstances" for which *Leedom* jurisdiction is reserved. *Purdue Farms, Inc. v. NLRB*, 108 F.3d 519, 521 (4th Cir. 1997) ("The narrow exception . . . recognized in *Leedom* applies only under extraordinary circumstances." (internal quotation marks omitted)). Indeed, the Board plainly violated its statutory mandate twice over.

First, it violated that mandate at the initial step of its new analysis, when it concluded that the FRTs and FRTIs lacked *any* community of interest, without giving *any* weight to the proposed unit's common "rates of pay, wages, hours of employment" and despite acknowledging what the Board conceded were "nearly identical terms and conditions of employment." *Boeing* Slip Op. 4. The Board thus accorded no weight whatsoever to the very aspects of employment the statute delineates as the subjects for collective bargaining—which Congress has defined as "collective bargaining in respect to *rates of pay, wages, hours of employment*, or other conditions of employment," 29 U.S.C. § 159(a)—while purportedly discharging its statutory obligation to select a bargaining "unit appropriate *for the purposes of collective bargaining*," 29 U.S.C. § 159(b) (emphases added). By ignoring the congressionally declared purposes of collective bargaining while reaching its conclusion on the group of employees that would be appropriate for those very purposes, the Board acted contrary to express statutory language.

Second, at the second step of its new test, where the Board purported to balance the collective-bargaining interests of the employees who sought to be represented against those of employees who had not sought such representation, the Board wrongly required the FRTs' and FRTIs' chosen representative to demonstrate that the petitioned-for unit was *more* appropriate

than the plant-wide bargaining unit for which Boeing argued, thereby violating the express

statutory mandate that an appropriate bargaining unit may be a mere "subdivision" of a plant, 29

U.S.C. § 159(b), and need only be "*a* unit appropriate for" collective bargaining, rather than the

most appropriate unit, 29 U.S.C. § 159(a) (emphasis added).

At the outset, the contradiction between the first and second steps of the Board's analysis

underscores the lawless nature of the Board's decision.  After all, every one of the interests the

FRTs and FRTIs shared with employees off the flight line, they also shared with each other.  At

step one of the Board's analysis, those shared interests—even when combined with the

distinctive interests that the FRTs and FRTIs shared with one another, but with no other Boeing

employees—were "too disparate to form a community of interest" *at all*.  *Boeing* Slip Op. 4.  At

step two, however, even *fewer* shared interests were enough to create a plant-wide community of

interests "far more significant than those [interests] that differentiate" the FRTs and FRTIs from

Boeing's other employees.  *Boeing* Slip Op. 6.  The Board offered no explanation for this

contradiction: how the same common interests *sufficient* to warrant a finding at step two that the

FRTs and FRTIs had a community of interest with excluded production and maintenance

employees were, at step one, *completely inadequate* to demonstrate that the FRTs and FRTIs had

a community of interest with each other.  It is difficult to imagine a decision less faithful to the

fundamental policy of the Act "to protect[] the exercise by workers of full freedom of

association, self-organization, and designation of representatives of their own choosing, for the

purpose of negotiating the terms and conditions of their employment."  29 U.S.C. § 151.

Finally, by waiting over 15 months after the FRTs and FRTIs resoundingly voted for

union representation, the Board granted Boeing the unilateral power to block the IAM from ever

obtaining judicial review of the Board's lawless decision in Boeing's favor.  We turn to each of those points below.

I.    **The Board violated its statutory mandate by according no weight to the FRTs' and FRTIs' shared wages, hours, and other conditions of employment.**

Subsection 9(b) of the NLRA commands that "[t]he Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the *unit appropriate for the purposes of collective bargaining* shall be the employer unit, craft unit, plant unit, or subdivision thereof."  29 U.S.C. § 159(b) (emphasis added).  In the immediately preceding subsection, Congress defined "the purposes of collective bargaining" as bargaining "in respect to rates of pay, wages, hours of employment, or other conditions of employment."  29 U.S.C. § 159(a).  When it fulfills its statutory obligation to select a "unit appropriate for the purposes of collective bargaining," the Board thus must give some weight to the proposed unit's shared "rates of pay, wages, hours of employment, or other conditions of employment."  There is no other plausible reading of the statute.  Because the Board here gives no weight at all to the only factors identified in the Act as central to determining whether a unit is appropriate, it has acted in derogation of its statutory duties—the very lawless conduct that this Court has the power to remedy under *Leedom*.

Tacitly acknowledging the strength of this argument, the Board and Boeing attempt to read Section 9(a) out of the statute altogether, asserting that Section 9(a) imposes no duty on the Board.  Bd. MTD 17; *see also* Boeing MTD 16-17.  This claim misstates the IAM's argument and misapplies basic principles of statutory interpretation.  The IAM's argument is that the Board's statutory obligation derives from Section 9(*b*), which the Board does not—indeed, cannot—claim is anything less than mandatory; the subsection's inclusion of the imperative "word 'shall' usually connotes a requirement."  *Kingdomware Techs., Inc. v. United States*, 136

14

S. Ct. 1969, 1977 (2016).  But that mandatory subsection's reference to "the purposes of collective bargaining," 29 U.S.C. § 159(b), must be read in light of the purposes of collective bargaining specified in Section 9(a), the immediately preceding subsection.  Indeed, statutory "language is not read in isolation, rather '[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"  *Lynch v. Jackson*, 853 F.3d 116, 121 (4th Cir. 2017) (alteration in original) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).[9]

The Board suggests that this Court should disregard that fundamental rule on the shaky ground that *Leedom* jurisdiction does not encompass disputes "over the proper interpretation of a statute."  Bd. MTD 12.  That cannot be, for "[e]very application of a text to particular circumstances entails interpretation."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 53 (2012); *accord, e.g.*, *Marbury*, 5 U.S. (1 Cranch) at 177 ("Those

---

[9] The IAM's reliance on the interplay between the express statutory mandate in Section 9(b) and the definition of the purposes of collective bargaining in Section 9(a) distinguishes this case from *Road Sprinkler Fitters Local Union No. 669 v. NLRB*, 324 F. Supp. 3d 85 (D.D.C. 2018), on which Defendants and Boeing both rely.  That case rejected *Leedom* jurisdiction to review the Board's application of the so-called "contract bar" doctrine—a doctrine unmoored from any specific statutory command that prohibits, in certain circumstances, decertification elections for a three-year period following the effective date of a collective-bargaining agreement.  *Id.* at 89-90. The plaintiff in that case argued that application of that "contract bar" would have required an election in a specific, multi-employer bargaining unit, an assertion that the plaintiff attempted to ground in Section 9(a).  *Id.* at 93.  The court rejected that gambit, both (1) because the contract bar is a Board-made rule that "appears nowhere in statute" and (2), in the alternative, because "Section 9(a) . . . places no requirement on the Board to recognize a particular bargaining unit"—let alone "to conduct elections only at the level of the [plaintiff union's] multi-employer unit."  *Id.* at 94-95 (internal quotation marks omitted).  Notably, the court specifically contrasted Section 9(a), which "does not impose *any* obligation on the Board," with Section 9(b), which contains an express command.  *Id.* at 94.  And, as noted, the IAM relies on Section 9(b) in this litigation—albeit construed, as basic rules of statutory interpretation require, in the context of the remainder of the statute, including Section 9(a).  Equally significant, the IAM does *not* argue that the Board is statutorily obligated to recognize any specific bargaining unit, only that it must accord *some* weight to the statutorily specified purposes of collective bargaining when selecting a bargaining unit appropriate for those purposes.

who apply the rule to particular cases, must of necessity expound and interpret that rule."). Indeed, in a case premised on *Leedom* jurisdiction, the Fourth Circuit applied the basic principle that we invoke here—namely, that "[a] court must endeavor to see a statute whole, not to construe statutory sections or phrases in isolation," as the Board and Boeing wrongly suggest. *Gracey v. Int'l Bhd. of Elec. Workers, Local Union No. 1340*, 868 F.2d 671, 675 (4th Cir. 1989); *see also id.* at 674 n.1 (invoking the Court's *Leedom* jurisdiction).

Although the Board and Boeing correctly point out that this Court lacks jurisdiction "[w]hen the statute in question is capable of two *plausible* interpretations," *Hanaeur v. Reich*, 82 F.3d 1304, 1309 (4th Cir. 1996) (emphasis added), the Board advances no such plausible construction here. At best, the Board and Boeing contend that the Section 9(a) specification that the purpose of collective bargaining is "bargaining with respect to rates of pay, wages, hours of employment, or other conditions of employment," 29 U.S.C. § 159(a), merely "describes what the representatives of a 'unit appropriate for [collective bargaining]' bargain *about*" and is thus irrelevant to the question "whether a unit of employees is appropriate *prior* to a certification." Boeing MTD 17 (alteration and emphasis in original); Bd. MTD 17 (emphasis in original). But the statute itself forecloses that effort to disaggregate the selection of an appropriate bargaining unit from the underlying purposes of collective bargaining. Indeed, as we have pointed out, Section 9(b) commands the Board to select a "unit appropriate for the purposes of collective bargaining." 29 U.S.C. § 159(b). The Board is thus powerless to accord no weight to the statutorily specified purposes of that bargaining in its selection of a bargaining unit. The Board's contrary interpretation ignores the express words of the statute. That interpretation is, at best, implausible: the idea that the governing statute allows the Board to select a unit "appropriate for

16

collective bargaining" without obligating consideration of the statutorily articulated "purposes of collective bargaining" begs credulity.

Indeed, case law confirms the significance of wages, hours, and other terms and conditions of employment to the determination of a unit appropriate for the purposes of collective bargaining. *See Chamber of Commerce*, 74 F.3d at 1330 ("Nor do we think it can possibly matter for purposes of reviewability whether the alleged statutory right or mandate is found in the statute in so many words or has been so interpreted by the Supreme Court."). Relying on Supreme Court precedent, the D.C. Circuit long ago observed that "[t]he central test [for bargaining-unit determinations] is whether the workers share a 'community of interest,' that is, 'substantial mutual interests in wages, hours, and other conditions of employment.'" *Skyline Distribs. v. NLRB*, 99 F.3d 403, 406 (D.C. Cir. 1996) (quoting *Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 172 (1971)). Although the IAM cited that case in its Complaint, Compl. ¶ 36, the Board offers no response, other than to note that *Skyline* also recognized that unit determinations are burdened by no "per se rules." Bd. MTD 18 (quoting *Skyline*, 99 F.3d at 407). That observation, however, is undisputed and irrelevant.

Moreover, to recognize that the Board must give *some* weight to the statutorily specified purposes of collective bargaining—"rates of pay, wages, hours of employment, or other conditions of employment"—does nothing to contradict the oft-repeated observation that, in selecting an appropriate bargaining unit, "the Board exercises the widest possible discretion." *Nestle Dreyer's Ice Cream Co. v. NLRB*, 821 F.3d 489, 494 (4th Cir. 2016) (internal quotation marks omitted). And it does not suggest that those statutorily specified considerations must be given any particular weight, let alone that they are somehow conclusive, as the Board

mischaracterizes the IAM's argument.  Bd. MTD 18.  Indeed, in the exercise of the Board's

broad discretion, it may even evaluate factors found nowhere in the statute.  *See, e.g.*, *Nestle*, 821

F.3d at 495 (listing permissible community-of-interest factors, including factors in addition to

those listed in the statute).

But what the Board *cannot* do is accord no weight whatsoever to the statutorily

mandated purposes of collective bargaining—that is, "bargaining in respect to rates of

pay, wages, hours of employment, or other conditions of employment," 29 U.S.C.

§ 159(a)—when it selects a "unit appropriate for the purposes of collective bargaining,"

29 U.S.C. § 159(b).  Indeed, it is a "well-established rule" of administrative law that an

agency cannot entirely "fail[] to consider a factor mandated by its organic statute."

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carriers Safety Admin.*, 656

F.3d 580, 587 (7th Cir. 2011) (applying arbitrary-and-capricious review under the

Administrative Procedure Act).  Even where, as here, an agency "has significant

discretion in deciding how much weight to accord each statutory factor . . . it is not free

to ignore any individual factor entirely."  *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923,

934 (5th Cir. 1998) (arbitrary-and-capricious review).

The Board insists, however, that its wide discretion to select an appropriate

bargaining unit is unconstrained by the congressionally delineated purposes of collective

bargaining.  In the Board's view of its own unbounded discretion, it apparently could find

appropriate, for example, a unit of all employees with red hair based solely on the

employees' sharing of that common characteristic.  That outlandish interpretation of the

statute would risk transforming Section 9(b) into an unconstitutional delegation of

legislative power shorn of any intelligible principle to guide the Board's discretion.  *See,*

*e.g.*, *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) ("The constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion."); *see also id.* at 2131 (Gorsuch, J., dissenting) (expressing a desire to widen the scope of the non-delegation doctrine). This Court should, of course, avoid any interpretation of the Act that risks running afoul of this constitutional constraint. *See, e.g.*, *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989) ("In recent years, our application of the nondelegation doctrine principally has been limited to the interpretation of statutory texts, and, more particularly, to giving narrow constructions to statutory delegations that might otherwise be thought to be unconstitutional."). However great the Board's discretion may be to determine which units are appropriate for bargaining, it cannot be as unconstrained as the Board and Boeing claim; that discretion must be exercised within the confines of the Act's explicit mandates.

The Board ignored those mandates in its *Boeing* decision. There, the Board concluded that the statutorily specified purposes of collective bargaining were due *no weight whatsoever* when it applied the first step of its newly minted, three-part analysis. After all, the Board reversed the Regional Director's determination that the FRTs and FRTIs "share[d] a sufficiently distinct community of interest" to form an appropriate bargaining unit, RD Slip Op. 25, not by concluding that their community of interest was *insufficient*, but by summarily concluding that their interests were "too disparate to form a community of interest *at all*, such that they *entirely* "lack[] an internal community of interest." *Boeing* Slip Op. 4-5. The Board came to that conclusion even though it expressly recognized that Boeing's FRTs and FRTIs "share nearly identical terms and conditions of employment." *Boeing* Slip Op. 4. Although the Board did not specify the

19

ignored "terms and conditions of employment" that were "nearly identical," on the record

developed before the Hearing Officer and as found by the Regional Director, the FRTs

and FRTIs shared identical "rates of pay, wages, hours of employment": the statutorily

delineated collective-bargaining subjects. *See* RD Slip Op. 25. The Board thus

necessarily determined that those identical terms and conditions of employment—the

very terms and conditions of employment expressly stated in the Act—carried no weight.

       Boeing—but notably *not* the Board—disagrees with this interpretation of the first step in

the Board's analysis, going so far as to accuse the IAM of "misstat[ing] the Board's decision."

Boeing MTD 19. Because the Board began its analysis with the phrase "[o]n balance" and

referred to the FRTs' and FRTIs' "nearly identical terms and conditions of employment," Boeing

argues that the Board must have weighed those identical terms and conditions in the proverbial

balance. Boeing MTD 19 (quoting *Boeing* Slip Op. 4). "Stating that a factor was considered,

however, is not a substitute for considering it." *Getty v. Fed. Sav & Loan Ins. Corp.*, 805 F.2d

1050, 1055 (D.C. Cir. 1986). More importantly, the logic of the Board's analysis contradicts

Boeing's effort to defend it. Had the Board accorded any weight whatsoever to the FRTs' and

FRTIs' admittedly identical terms and conditions of employment, it would have necessarily

concluded that the FRTs and FRTIs shared *some* community of interest, even if those interests

were insufficient to form an appropriate bargaining unit. Basic logic compels the conclusion

that, because the Board determined that the FRTs and FRTIs shared no community of interest at

all, it did not accord any weight whatsoever to those identical conditions of employment. *Cf.*

*Wadsworth v. Word of Life Christian Ctr.*, 737 F.3d 1268, 1274 (10th Cir. 2013) (applying the

logical contrapositive).

That determination violates the statutory mandate that the Board accord at least some weight to the FRTs' and FRTIs' shared "rates of pay wages, hours of employment, or other conditions of employment." 29 U.S.C. § 159(a). The Board, in the exercise of its unquestionably wide discretion, is free to hold those shared conditions of employment insufficient to form the basis for an appropriate bargaining unit. And it is free to weigh additional, unenumerated criteria in its analysis. But what it cannot do is ignore those statutorily enumerated criteria; it cannot give them no weight. The Board's *Boeing* decision—which does precisely what the statute forbids—cannot stand.

## II.   The Board violated its statutory mandate by adopting the entirely novel requirement that a proposed unit consisting of only some, but not all, of a plant's employees be *more* appropriate than a plant-wide unit.

The second part of the Board's decision is as much an egregious departure from the plain meaning of the Act as the first. Here the Board has overturned the results of the employees' vote on the ground that a larger unit would be more appropriate than the one chosen by the employees. But that logic is directly contrary to the mandate of the statute, which requires the Board to assure that the bargaining unit is "appropriate" and does not allow it to reject the employees' chosen bargaining unit because it is not the *most* appropriate unit.

As we have already explained at length, Section 9(b) commands the Board to select a "unit *appropriate* for the purposes of collective bargaining." 29 U.S.C. § 159(b) (emphasis added). As the Board itself acknowledged more than half a century ago, the term "[a]ppropriate is a word with a well-defined meaning"—namely, "'[s]uitable for the purpose and circumstances; befitting the place or occasion'"—and it "carries with it no overtones of the exclusive or the ultimate or the superlative. To convey such thoughts, the words 'only' or 'ultimate' or 'most' must be conjoined with the word 'appropriate.' The statute does not conjoin

them." *Morand Bros. Beverage Co.*, 91 NLRB 409, 418 n.13 (1950) (quoting *Webster's International Dictionary*), *enf'd*, 204 F.2d 529 (7th Cir. 1953). Consistent with the plain meaning of that statutory command, courts have long held that "[t]he Board need only select an appropriate unit, not the most appropriate unit." *Cleveland Constr., Inc. v. NLRB*, 44 F.3d 1010, 1013 (D.C. Cir. 1995). *Accord, e.g.*, *Nestle*, 821 F.3d at 494-95 ("The Board may approve any appropriate unit; it need not identify and select 'the single most appropriate unit.'" (quoting *NLRB v. Enter. Leasing Co. Se.*, 722 F.3d 609, 625 (4th Cir. 2013)); *FedEx Freight, Inc. v. NLRB*, 816 F.3d 515, 523 (8th Cir. 2016) ("[I]t is a longstanding principle of unit determination under the community of interest test that the Board need only certify *an* appropriate bargaining unit, rather than *the* most appropriate one." (internal quotation marks omitted)); *id.* at 523 n.2 (collecting cases from outside the Eighth Circuit).

Other features of the statute confirm that it commands the Board to select any petitioned-for unit that is appropriate, not the *most* appropriate unit. As we have noted, *supra* Part I, *Leedom* jurisdiction certainly does not preclude this Court from applying the basic principle of interpretation that "[a] court must endeavor to see a statute whole, not to construe statutory sections or phrases in isolation." *Gracey*, 868 F.2d at 675. And the statutory subsection immediately preceding Congress' command to the Board, Section 9(a), provides for exclusive representation "in *a* unit appropriate for" the purposes of collective bargaining. 29 U.S.C. § 159(a) (emphasis added). No less an authority than the Supreme Court has explained that this provision means "that employees may seek to organize 'a unit' that is 'appropriate'—not necessarily *the* single most appropriate unit." *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 610 (1991) (emphasis in original). And, as we have already noted, *supra* Part I, for the purposes of *Leedom* jurisdiction it is irrelevant "whether the alleged statutory right or mandate is found in the

statute in so many words or has been so interpreted by the Supreme Court." *Chamber of Commerce*, 74 F.3d at 1330.

The Board is in no position to deny this axiomatic construction of the statute. For over half a century, it has endorsed the plain language interpretation that "[t]here is nothing in the statute which requires that the unit for bargaining be the *only* appropriate unit, or the *ultimate* unit, or the *most* appropriate unit; the Act requires only that the unit be 'appropriate.'" *Morand Bros.*, 91 NLRB at 418 (emphases in original). *Accord, e.g.*, *In re Bartlett Collins*, 334 NLRB 484, 484 (2001) ("It is well settled that the unit need only be an appropriate unit, not the most appropriate unit," but rejecting a wall-to-wall unit in a production facility); *Overnite Transp. Co.*, 322 NLRB 723, 723 (1996) (same, approving a unit that excluded certain of an employer's workers). An interpretation of the statute that "is consistent with the Board's longstanding practice is persuasive evidence that it is the correct" interpretation. *New Process Steel, LP v. NLRB*, 560 U.S. 674, 683 (2010). And the Board cannot abandon its longstanding construction of the statute without acknowledging and justifying that abandonment. *See, e.g.*, *Balt. Gas & Elec. Co. v. Heintz*, 760 F.2d 1408, 1418 (4th Cir. 1985) ("It is a well-settled proposition of administrative law that when an agency deviates from established precedent, it must provide a reasoned explanation for its failure to follow its own precedents.").

Indeed, in *Boeing*, the Board purported to apply this inescapable understanding of its statutory mandate: "[A] proposed unit need only be *an* appropriate unit," the Board intoned, "not the *most* appropriate unit." *Boeing* Slip Op. 3. Unable to depart openly from the statute's plain meaning, the Board asserted that the second step of its new analysis does not "contemplate that a unit would be found inappropriate merely because a different unit might be more appropriate." *Boeing* Slip Op. 4.

According to Boeing, the Board's recitation of this basic legal principle in the *Boeing* decision[10] precludes this Court from looking any more closely, because doing so would enable "an aggrieved party . . . [to] gin up jurisdiction merely by asserting that the Board adopted an idea it explicitly rejected." Boeing MTD 21. But endorsing that remarkable and unsupported argument would permit unaccountable agencies to insulate their handiwork from judicial oversight via the simple expedient of asserting that the agency followed the law. Unsurprisingly, courts refuse to accept the "absurd" proposition that an agency's decision is immune from oversight merely because it reels off the applicable legal principles. *Sugar Cane Growers Co-op v. Veneman*, 289 F.3d 89, (D.C. Cir. 2002) ("Referencing a requirement is not the same as complying with that requirement.").

The simple and unavoidable fact is that the logic of the Board's *Boeing* decision directly violates the legal principle that the Board purported to apply. As noted, *supra* p. 9-10, the second step of the Board's freshly minted three-step analysis compares the petitioned-for unit with a hypothetical bargaining unit (raised by Boeing in response to the IAM petition) composed of *all* employees within the plant. *Boeing* Slip Op. 4.[11] The Board thus was reviewing two

---

[10] Boeing is late to acknowledge the long-standing precedent that multiple different units might be appropriate in any particular workplace, including its North Charleston facility. Throughout the proceeding before the Regional Director and subsequently before the Board, Boeing contended vociferously that only an overall unit of all production and maintenance workers was appropriate in an integrated production facility such as North Charleston. *See, e.g.*, RD Slip Op. 3. It stuck to this contention without regard for the cases cited above, particularly including the Fourth Circuit's recent decision in *Nestle*, where the Court of Appeals upheld a Board decision finding a lesser included unit of 118 maintenance workers appropriate in an integrated production facility, despite the employer's contention that the appropriate unit had to combine the maintenance workers with its 578 production employees. *Nestle*, 821 F.3d at 496-98.

[11] To be sure, in *Boeing*, the Board drew on language from the Second Circuit's recent decision, *Constellation Brands v. NLRB*, 842 F.3d 784, 792 (2d Cir. 2016), which upheld the Board's now-abandoned approach to unit determinations articulated in *Specialty Healthcare & Rehabilitation Center of Mobile*, 357 NLRB 934 (2011), *enf'd sub nom. Kindred Nursing Ctrs. E., LLC v. NLRB*, 727 F. 3d 552 (6th Cir. 2013). In *Constellation Brands*, the Second Circuit

potential bargaining units of employees: (1) a unit of only the FRTs and the FRTIs and (2) a

plant-wide unit that included the FRTs and FRTIs.

>The critical portion of the Board's comparison states:

>At most, FRTs and FRTIs are a group of employees with higher wages and A&P licenses working in a physically separate area that tend to stay in their respective job classifications. However, the interests they share with excluded employees are far more significant than those that differentiate them. FRTs and FRTIs are fully functionally integrated with excluded employees, share departments with excluded employees, share supervision with excluded employees, perform a significant portion of the same job functions as excluded employees, share most terms and conditions of employment with excluded employees, and share most of the same skills and training with excluded employees. We find that excluded production-and-maintenance employees would largely have the same interest as FRTs and FRTIs in the context of collective bargaining, and thus the petitioned-for unit's distinct interest certainly do not outweigh the interests shared with excluded employees.

*Boeing* Slip Op 6.

>What is clear from this excerpt is: (1) The FRTs and FRTIs share certain community-of-

interest factors that are different from those of production and maintenance employees; (2) the

FRTs and FRTIs also share a number of community-of-interest factors with production and

maintenance employees; (3) in the Board's view, the shared factors outweigh the differentiating

---

observed that, in selecting an appropriate unit, the Board must "explain why excluded employees have meaningfully distinct interest in the context of collective bargaining that *outweigh* similarities with unit members." *Id.* at 794. But the Second Circuit offered no explanation for that balancing analysis, relying only on a pair of "*cf.*" citations to decisions that did not, themselves, require any balancing. *Id.* at 794 n.43 (citing *NLRB v. FedEx Freight, Inc.*, 832 F.3d 432, 443 (3d Cir. 2016), and *Staten Island Univ. Hosp. v. NLRB*, 24 F.3d 450, 454 (2d Cir. 1994)); *see also The Bluebook: A Uniform System of Citation* 5 (20th ed. 2015) (reserving the "*cf.*" signal for authorities "different from the main proposition but sufficiently analogous to lend support"). And the stated purpose of the Second Circuit's unsupported comment was merely to ensure "that employees are not inappropriately 'excluded [from a bargaining unit] on the basis of meager differences,'" not to require that the petitioned-for unit be more appropriate than a plant-wide unit. *Constellation*, 842 F.3d at 794 (quoting *Nestle*, 821 F.3d at 500). The Second Circuit never endorsed that latter proposition, notwithstanding the Board's reliance here on a shard of language shorn of its context and deployed in support of precisely such a maneuver.

factors; and (4) based on the characteristics which the FRTs and FRTIs share with production and maintenance employees, the Board determined that a separate unit of FRTs and FRTIs was inappropriate.

When the Board found that the FRTs and FRTIs shared many community-of-interest factors with the production and maintenance employees, it necessarily concluded that the FRTs and FRTIs shared those same community-of-interest factors with each other.  That means that, in performing its analysis, the Board was comparing two groups of employees that shared the same common characteristics; two groups which were, at least with respect to those shared characteristics, equivalent.  Under these circumstances, to find one of these two otherwise equivalent groups was an inappropriate bargaining unit, the Board had to decide that one was *more* appropriate than the other; there is no other basis on which to reach the Board's conclusion once the Board found that the two groups equivalently shared the same community-of-interest factors.[12]

That determination is flatly inconsistent with the statutory rule that the Board claimed to embrace in *Boeing*—namely, that it select "'a unit' that is 'appropriate'—not necessarily *the* single most appropriate unit."  *Am. Hosp. Ass'n*, 499 U.S. at 610 (emphasis in original).  And that unlawful determination, like the other basis of the Board's decision, must fall.

*       *       *

---

[12] As Member McFerran stated in her *Boeing* dissent:  The majority "find[s] the unit inappropriate based on factors which apply to every single production and maintenance employee at the plant, leading to the inescapable conclusion that the *only* appropriate bargaining unit here, at least under the majority's analysis, is one that combines every production and maintenance employee at the Employer's North Charleston plant—a unit that would include approximately 2,700 employees.  That conclusion cannot be reconciled with the 'traditional community-of-interest standard' that *PCC Structurals* claimed to reinstate."  *Boeing* Slip Op. 7.

In sum, the *Boeing* decision violates the Board's statutory mandate twice over: first, by according no weight to factors that the statute requires the Board to consider and then, second, by adopting a standard that requires it to select the most appropriate of two potential bargaining units. Because the *Boeing* decision was premised on determinations that were in excess of the Board's statutory powers, this Court has jurisdiction to strike that decision down, so long as the IAM has no meaningful and adequate alternative means to otherwise hold the Board to the terms of the statute. As we now show in Part III, below, this litigation is the *sole* means by which to vindicate the plain meaning of the Act.

**III.    By waiting 15 months after the election to issue its decision in favor of Boeing, the Board also empowered Boeing to insulate that decision from judicial oversight, leaving this lawsuit as the sole meaningful and adequate means to vindicate the statutory rights of the FRTs and FRTIs.**

Ironically, the Board seeks to foreclose this Court's jurisdiction out of respect for Congress' decision to "vest[] the Board with authority to *swiftly* resolve questions of union representation," trumpeting a statutory scheme intended "to provide a *speedy* resolution to questions of employee choice and bargaining obligations." Bd. MTD 2, 9 (emphases added). But the Board's approach to the *Boeing* decision was anything but swift; the Board waited some 15 months after the election and certification to issue a decision that deprived the FRTs and FRTIs of their choice of representative and handed Boeing the victory it had proven unable to win at the ballot box.[13] By dragging its feet, the Board also handed Boeing a trump card,

---

[13] The Board has acknowledged elsewhere its own dilatory actions in this case. In its recently promulgated rule revising its representation election case procedures, the Board deemed it "worth emphasizing that the Board is charged with the expeditious *resolution* of questions of representation." *Representation-Case Procedures*, 84 Fed. Reg. 69,524, 69,529 (Dec. 18, 2019) (emphasis in original). Nevertheless, the Board noted that "[t]he mere fact that elections are taking place more quickly does not necessarily mean that this speed is promoting finality or the most efficient *resolution* of the question of representation." *Id.* (emphasis in original). For support, the Board cited its *Boeing* decision as an example of its failure to resolve cases

permitting the company to insulate the Board's decision from oversight by blocking the path to

review of this particular case—Case 10-RC-215878—via violation of Section 8(b)(7)(C), 29

U.S.C. § 158(b)(7)(C), that the Board now presses the IAM to pursue.

Had the Board resolved the *Boeing* case in the swift and speedy manner intended by

Congress, then the IAM might not have been forced to initiate this litigation.  That is because the

IAM might have been able to secure review of the *Boeing* decision by picketing, in violation of

Section 8(b)(7)(B),[14] to force Boeing to recognize and bargain with the FRTs' and FRTIs'

chosen representative within 12 months of the election certification that the Board nullified.  *See*

*Retail Store Emps.' Union, Local 692 (Irvins, Inc.)*, 134 NLRB 686, 689 (1961) ("[T]he decisive

date for purposes of ascertaining when there has been a valid election conducted . . . is the date

on which . . . a certification of results is issued in a Board-conducted election.").  The unit

determination on which that election certification was premised—namely, the *Boeing* decision—

would have then been incorporated into the record of the unfair labor practices proceeding, 29

U.S.C. § 159(d), which the IAM ultimately could have petitioned a federal circuit court to

review, 29 U.S.C. § 160(f).  The IAM would likely have preferred to pursue that path; after all,

judicial review of Board unfair labor practice determinations, while deferential, is still more

searching than the standard under *Leedom*.  *See, e.g.*, *Universal Camera Corp. v. NLRB*, 340

---

efficiently: "[I]n *The Boeing Co.*, 368 NLRB No. 67 (2019), an election took place on May 31, 2018, but the Board ultimately granted review, reversed the Regional Director's finding that the petitioned-for unit was appropriate, and dismissed the petition on September 9, 2019."  *Id.* at 69,529 n.19.  Unfortunately, the Board's solution, in its new rule, to this problem of its own procrastination is not to commit to deciding cases in a timely manner, but rather to stay the Regional Director's issuance of a certification until a pending request for review is decided, thereby enabling its own continued sluggishness to postpone the employer's obligation to bargain with a union that has prevailed in the election.  *Id.* at 69,553-56.

[14] Section 8(b)(7)(B) provides that it is an unfair labor practice for a union to picket for recognition "where within the preceding twelve months a valid election under section 159(c) of this title has been conducted."  29 U.S.C. § 158(b)(7)(B).

U.S. 474, 487-88 (1951) (holding that 29 U.S.C. § 160 authorizes the courts to evaluate whether

the Board's conclusions are supported by substantial evidence).  But the Board does not—

indeed, cannot—rebut the IAM's allegation that its sluggish treatment of the *Boeing* matter—

deciding Boeing's request for review more than 12 months after the election certification—

blocked the IAM from pursuing that path.  Bd. MTD 23-24; *see also* Compl. ¶ 52.

Instead, the Board faults the IAM for failing to pursue an entirely abortive path to review.

It complains that the IAM should have violated Section 8(b)(7)(C) in its effort to secure judicial

accountability for the Board's refusal to permit the FRTs and FRTIs to select a representative of

their own choosing.  Bd. MTD 24 (citing 29 U.S.C. § 158(b)(7)(C)).  That provision prohibits

picketing to secure recognition or bargaining—but only where a petition for a secret-ballot

election has not been filed within a reasonable period of time not to exceed 30 days.  29 U.S.C.

§ 158(b)(7)(C).  Other than one terse reference in a footnote, Bd. MTD 23 n.11, the Board fails

to acknowledge that Section 8(b)(7)(C) prohibits picketing *only* in the absence of an election

petition.  Still less does the Board acknowledge the proviso to that prohibition, which states

"[t]hat when such a petition has been filed the Board shall forthwith . . . direct an election in such

unit as the Board finds to be appropriate and shall certify the results thereof."  29 U.S.C.

§ 158(b)(7)(C).  Such a petition may be filed by anyone, including the employer.  29 C.F.R.

§ 102.76 (incorporating by reference 29 C.F.R. § 102.60, which authorizes "an employee or

group of employees or any individual or labor organization acting in their behalf or an employer"

to file a petition).  And it is longstanding, blackletter Board law that the filing of such a petition

and the ensuing election moots any unfair labor practices charge.  *See, e.g.*, *Int'l Hod Carriers*

*Bldg. & Common Laborers Union of Am., Local 840 (C.A. Blinne Constr. Co. (II))*, 135 NLRB

1153, 1169 (1962); 29 C.F.R. §§ 102.75, 102.81(a).  Put simply, someone—*anyone*—can block

unfair labor practices proceedings under § 158(b)(7)(C) by simply filing a valid election petition.

      That means that, by filing such a petition, Boeing could unilaterally block the IAM from

following the path to review that the Board proposes.  Even if the IAM picketed for recognition,

even if someone filed an unfair labor practice charge to restrain that picketing, and even if the

Regional Director issued a complaint on that charge, then Boeing would nonetheless remain

empowered to shut down the process by initiating an entirely new secret-ballot election.  And in

the absence of any unfair labor practice proceedings, there would be no final order that the IAM

could petition the federal courts to review.  Should the election be conducted, it would be

conducted in the unit found appropriate by the Board based on Boeing's petition—in the plant-

wide unit that Boeing has contended all along is the only appropriate unit, that the Board has

already indicated is, in its view, the only appropriate unit, and that is decidedly not the flight-line

unit in which the IAM won the election in the instant case.  Should the IAM chose to continue its

picketing after such an election, any subsequent unfair labor practice case would involve this

second, Boeing-petitioned-for election.  Such a proceeding would not be a mechanism for the

IAM to obtain review of this *Boeing* decision, which denied the FRTs and FRTIs the right to

representation by a union that they had already selected in a prior secret-ballot election.  Boeing

can thus unilaterally block the Board's proposed path to review of *this* case.

      Relying on the Ninth Circuit's decision in *Pacific Maritime Association v. NLRB*, 827

F.3d 1203 (9th Cir. 2016), the Board contends that, "even if a potential path to judicial review

may not come to fruition because of future events outside a challenging party's control, this does

not mean that such an alternative is not viable until it has been exhausted."  Bd. MTD 25.  But

*Pacific Maritime* did not consider anything like the circumstances of this case, in which the

IAM's adversary, Boeing, can unilaterally foreclose review.  To the contrary, the *Pacific Maritime* case held that a third party could have sought judicial review of the Board's anticipated denial of its motion to intervene in unfair labor practice proceedings because it was permitted to seek review after the Board issued its final order resolving those proceedings.  *Pac. Maritime*, 827 F.3d at 2010-11.  Along the way, the Ninth Circuit rejected the argument that conditioning review on issuance of a final order "depends on a contingency that [the third party] cannot control . . . . because the unfair labor practice proceedings could terminate in a settlement (which [the third party] would have no ability to control), relieving the Board of the necessity of issuing a final order."  *Id.* at 1211.  As that Court explained, such settlement was "an unlikely event." *Id.* at 1212.  And endorsing the third party's argument "would swallow the rule.  *Any* unfair labor practice could, hypothetically, end in a settlement without a final order."  *Id.* (emphasis in original).

By contrast, there is nothing "unlikely" about Boeing exercising its unilateral power to block judicial review of the *Boeing* decision it won in the aftermath of a crushing electoral defeat.  After all, Boeing has intervened in these adversarial proceedings to insulate the Board's decision from even the modest judicial scrutiny afforded by *Leedom*.  There can be no doubt that it would act even more forcefully to preclude the more searching review of that decision that would be permitted following issuance of a final Board order.  Indeed, Boeing's otherwise thorough—and thoroughly aggressive—brief in this case is all but entirely silent on the question of whether the IAM has some meaningful and adequate means of vindicating its statutory

rights—no doubt because Boeing knows that, in light of its ability to unilaterally foreclose the

IAM's access to Section 8(b)(7)(C), no such means exist. [15]

Instead, this case is on all fours with the circumstances of *Leedom* itself, in which the

Supreme Court concluded that federal jurisdiction was merited because "there is no other means,

within [the plaintiffs'] control to protect and enforce" their statutory rights.  358 U.S. at 185.

The Court thus affirmed the D.C. Circuit's determination that conditioning review on issuance of

a final order in unfair labor practice proceedings premised on a party's refusal to bargain was

"too remote and conjectural" where the alleged statutory violation was the inclusion of

professional and non-professional employees in a single unit without securing the professional

employees' approval.  *Leedom v. Kyne*, 249 F.2d 490, 492 (D.C. Cir. 1957).  The D.C. Circuit

reasoned that, if the union refused to bargain on behalf of the non-professional employees the

Board required it to represent, then that unfair labor practice was not "likely . . . [to] induce the

employer to seek review since he would then be free to deal with all employees individually."

*Id.*; *accord, e.g.*, *Pac. Maritime*, 827 F.3d at 1203 ("[I]n *Leedom*, absent district court

jurisdiction, the union could only seek review in the extremely unlikely event that the employer

---

[15] Nor would rejecting the Board's argument in this case somehow "swallow the rule" against
review of representation decisions, unlike the circumstances of *Pacific Maritime*.  That is
because the Board's recently promulgated rule on representation election case procedures makes
the circumstances of the *Boeing* case unlikely to recur.  The new rules provide "that regional
directors will only issue certifications after the time for filing a request for review has passed
without any being filed.  If any request for review is filed, the certification will issue only after
the Board's ruling on that request."  *Representation-Case Procedures*, 84 Fed. Reg. 69,524,
69,554 (Dec. 18, 2019); *see also* 29 C.F.R. § 102.69(b).  Had the certification of results been
stayed until the Board issued its *Boeing* decision 15 months after the election—as the new rules
require—then the IAM could have picketed for recognition in violation of Section 8(b)(7)(B), 29
U.S.C. § 158(b)(7)(B), within 12 months of the issuance of that certification and thereby
triggered an unfair labor practice determination that would have permitted judicial review of the
*Boeing* decision.  *See supra* p. 28; *Retail Store Emps.' Union*, 134 NLRB at 689 (twelve-month
period for 8(b)(7)(B) runs from date of certification of election results, not date of election).

filed unfair labor practice charges upon the union's refusal to bargain."). By the *Leedom* employer's unilateral action, it could thus block judicial review.

Here, Boeing, like the employer in *Leedom*, is empowered to unilaterally insulate from judicial scrutiny a Board decision for which it fought—and continues to fight—vigorously. The Board granted Boeing that trump card when it delayed the *Boeing* decision for nearly 15 months following the FRTs' and FRTIs' selection of the IAM as their representative. Because the IAM has no other meaningful and adequate means of seeking judicial protection for those workers' right to its representation, this Court should invoke its *Leedom* jurisdiction and hold the Board to the plain meaning of the Act.

## CONCLUSION

For the reasons explained above, the Court should deny the motions to dismiss filed by the Board and by proposed intervenor Boeing.

DATED this 28th day of February 2020            Respectfully submitted,

                                                                /s/ Armand Georges Derfner
                                                                Armand Georges Derfner
District Court I.D. #528
Derfner & Altman, LLC
575 King Street, Suite B
Charleston, SC 29403
Ph.: (843) 723-9804
aderfner@derfneraltman.com

Richard F. Griffin, Jr., *pro hac vice*
Matthew H. Clash-Drexler, *pro hac vice*
Joshua A. Segal, *pro hac vice*
Bredhoff & Kaiser, PLLC
805 Fifteenth St., NW., Ste. 1000
Washington, DC 20005
Ph.: (202) 842-2600
rgriffin@bredhoff.com
mclashdrexler@bredhoff.com
jsegal@bredhoff.com

*Counsel for Plaintiff IAM*

33

**CERTIFICATE OF SERVICE**

I, Armand George Derfner, hereby certify that Plaintiff's Response in Opposition to Defendants' and Proposed Intervenor's Motions to Dismiss for Lack of Subject Matter Jurisdiction was electronically filed with the Clerk of the Court for the United States District Court for the District of South Carolina, Charleston Division this 28th day of February 2020 using the CM/ECF system, which will serve and notify all participants associated with the aforementioned Response.

/s/ Armand Georges Derfner
Armand Georges Derfner
District Court I.D. #528
Derfner & Altman, LLC
575 King Street, Suite B
Charleston, SC  29403
Ph.: (843) 723-9804
aderfner@derfneraltman.com